**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | |
|---|---|
| U.S. ANESTHESIA PARTNERS OF TEXAS, P.A., U.S. ANESTHESIA PARTNERS OF FLORIDA, INC., U.S. ANESTHESIA PARTNERS OF COLORADO, INC., and PHYSICIANS ANESTHESIA SERVICE, PLLC, <br><br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES CENTERS FOR MEDICARE AND MEDICAID SERVICES, XAVIER BECERRA, *in his official capacity as Secretary of Health and Human Services*, and CHIQUITA BROOKS-LASURE, *in her official capacity as Administrator of Centers for Medicare and Medicaid Services*, <br><br> *Defendants*. | Civil Action No. _____ |

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF**

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF**

Plaintiffs U.S. Anesthesia Partners of Texas, P.A., U.S. Anesthesia Partners of Florida, Inc., U.S. Anesthesia Partners of Colorado, Inc., and Physicians Anesthesia Service, PLLC bring this action for declaratory, injunctive, and mandamus relief against defendants the United States Department of Health and Human Services, the Centers for Medicare & Medicaid Services (CMS) and the current heads of those agencies in their official capacities, and allege as follows:

## INTRODUCTION

1.     This action under the Medicare Act and Administrative Procedure Act (APA) challenges CMS's decision to slash plaintiffs' Medicare reimbursement rates as part of its Merit-based Incentive Payment System (MIPS) program.  The MIPS program "assess[es] the total performance of each MIPS eligible professional," 42 U.S.C. § 1395w-4(q)(1)(A)(i), in order to "rewar[d] [providers] for improving the quality of patient care and outcomes," CMS, Quality Payment Program, *What is MIPS?*, https://qpp.cms.gov/mips/mvps/learn-about-mips (last visited Dec. 10, 2023).

2.     Plaintiffs are among the nation's highest-quality anesthesia provider groups.[1]  But plaintiffs nonetheless face steep financial penalties from CMS beginning in 2024, based on CMS's unlawful and arbitrary decision to attribute the actions of other clinicians—actions over which plaintiffs have no control—to plaintiffs.  Specifically, CMS's refusal to exclude certain non-physician practitioners at plaintiffs' specialty medical practices from its calculation of the "total per capita cost" measure under the MIPS program is contrary to law, arbitrary and capricious, and

---

[1] *See, e.g.*, Richard P. Dutton et al., *Scaling Up Quality in an Anesthesia Practice*, Int'l J. for Quality in Health Care, (Mar. 11, 2023) https://academic.oup.com/intqhc/article/35/1/mzad011/7076248.

results in a grossly disproportionate financial penalty in violation of the Excessive Fines Clause of the Eighth Amendment to the United States Constitution.

3.     CMS sets standard reimbursement rates for Medicare services each year through an annual rulemaking process.  For certain types of providers, including plaintiffs, those standard reimbursement rates are subject to adjustment through a mandatory Quality Payment Program, which includes the MIPS program.  This program aims to increase Medicare's efficiency by adjusting the standard rates for certain Medicare providers based on their performance across four categories, including cost.  A provider's or provider group's performance across these categories is reflected in an annual "MIPS score," which is calculated pursuant to a methodology issued by CMS.  *See* 42 U.S.C. § 1395w-4(q)(5)(A); 42 C.F.R. § 414.1380.  Those with performance above a benchmark specified by CMS receive a reimbursement bonus, while those with performance below the benchmark see their rates cut.

4.     Within the cost performance category, CMS has developed various cost measures, only some of which apply to any given MIPS participating provider.  One of those measures is the total per capita cost (TPCC) measure.  CMS designed the TPCC metric to "measur[e] the overall cost of care delivered to a patient" with a particular "focu[s] on the importance of successful payment models for primary care management."  CMS, *TPCC Measure Information Form* at 3 (2022), *available at* https://qpp.cms.gov/resources/document/d71c3d8c-d9f4-4cf2-8434-182c971 0ad0d.  The TPCC measure achieves this goal by assigning beneficiaries' total Medicare costs to the clinician who is responsible for the assigned beneficiaries' primary care, calculating the adjusted average monthly cost for all assigned beneficiaries, and then comparing this figure to a cost benchmark.  CMS itself has recognized that attributing costs to the provider actually

responsible for the beneficiary's primary care is critical to the fairness and accuracy of the TPCC measure. *See* 84 Fed. Reg. 62,568, 62,969–70 (Nov. 15, 2019).

5.      Relevant here, CMS has also recognized—yet inexplicably refused to fix—a serious problem in the agency's methodology for attributing costs to providers under the TPCC measure:  While CMS excludes specialty physicians, including anesthesiologists, from the TPCC measure because they are generally not responsible for a patient's primary care, the agency includes certain non-physician practitioners such as nurse practitioners and physician assistants, even if they solely furnish services in a medical group comprised only of excluded physician types. As a result, specialty practice groups like plaintiffs' can be held responsible for every cost a beneficiary incurs—despite having no control over those costs—solely because they employ cost-effective physician extenders to perform routine tasks such as pre-anesthesia consults.

6.      That is precisely what happened to plaintiffs.  Their anesthesia practices were scored on the TPCC measure only because CMS irrationally refused to exclude certain non-physician clinicians employed by the practices.  The consequences are devastating.  Without the TPCC measure, plaintiffs' performance would have earned each practice a reimbursement bonus in 2024, above Medicare standard rates; but with CMS's unreasonable and unfair application of the TPCC measure, they will receive a combined *penalty* estimated to slash $3.7 million from their Medicare reimbursement in 2024.  And, because they have no control over the patient costs for which they are being penalized, the same nonsensical result will occur again in future years.

7.      As applied to plaintiffs, the TPCC measure violates CMS's statutory mandate to "assess the total performance of each MIPS eligible professional," runs counter to the cost measure's stated purpose, and inflicts a massive financial penalty for third-party conduct entirely beyond plaintiffs' control.  Despite recognizing this problem, CMS ignored it without any rational

explanation.  Accordingly, this Court should declare the TPCC measure as applied to plaintiffs to be contrary to law and arbitrary and capricious in violation of the APA, and an excessive fine in violation of the Eighth Amendment, and should enjoin CMS from applying this irrationally punitive scheme to plaintiffs' past, present, and future Medicare reimbursements.

## PARTIES

8.     Plaintiff U.S. Anesthesia Partners of Texas, P.A. is a physician-owned Texas professional association with its principal place of business at 12222 Merit Drive, Suite 700, Dallas, Texas 75251.  Its network of anesthesiology practices provides services throughout the State of Texas, including in Potter County, through more than 2,600 clinicians.

9.     Plaintiff U.S. Anesthesia Partners of Florida, Inc. is a Florida corporation whose member practices provide anesthesia services in Florida, through nearly 800 clinicians.

10.     Plaintiff U.S. Anesthesia Partners of Colorado, Inc. is a Colorado corporation and a provider network under Colorado law whose member practices include approximately 660 clinicians who provide anesthesia services in Colorado.

11.     Plaintiff Physicians Anesthesia Service, PLLC is a physician-owned Washington professional limited-liability corporation providing anesthesia services in the State of Washington through 175 clinicians.

12.     Defendant Department of Health and Human Services (HHS) is an executive department of the United States headquartered in Washington, D.C.  CMS is a component agency of HHS.

13.     Defendant CMS is an executive agency of the United States and is headquartered in Baltimore, Maryland.  CMS administers the MIPS program.

14.     Defendant Xavier Becerra is the Secretary of HHS.  Secretary Becerra is sued in his official capacity only.

15.     Defendant Chiquita Brooks-LaSure is the Administrator of CMS.  Administrator Brooks-LaSure is sued in her official capacity only.

## JURISDICTION AND VENUE

16.     The Court has jurisdiction under 42 U.S.C. § 405(g) over this action challenging CMS's October 20, 2023 final decision denying plaintiffs' request to recalculate their MIPS scores. Alternatively, the Court has jurisdiction under 28 U.S.C. §§ 1331 or 1361.  *See Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 19 (2000); *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 766 (5th Cir. 2011).

17.     Venue is proper in this judicial district under 42 U.S.C. § 405(g) because at least one plaintiff's principal place of business is in this judicial district.  Alternatively, venue is proper in this judicial district under 28 U.S.C. § 1391(e) because this is an action against officers and agencies of the United States, at least one plaintiff resides in this district, and no real property is involved in this action.

## BACKGROUND

18.     The Medicare Access and CHIP Reauthorization Act of 2015 created the Quality Payment Program.  Pub. L. No. 114-10, tit. I, § 101(c), 129 Stat. 87, 92–114.  Certain clinicians furnishing services to the Medicare program, including plaintiffs, are required to participate in the Quality Payment Program.  One of two ways to satisfy the Quality Payment Program participation requirement is to participate in the MIPS program.  *See* 42 U.S.C. § 1395w-4(q)(1)(C); 42 C.F.R. § 414.1310(a); *see also* CMS, *Quality Payment Program*, https://www.cms.gov/medicare/quality/ value-based-programs/quality-payment-program (last visited Dec. 15, 2023).  In 2020, about 934,000 clinicians were eligible to participate in MIPS.  U.S. Gov't Accountability Off., *Medicare:*

*Performance-Based and Geographic Adjustments to Physician Payments* 5 (Oct. 19, 2023), https://www.gao.gov/assets/d24107106.pdf.

19.     The MIPS program aims to improve quality and value in the healthcare system by "assessing the total performance of each MIPS eligible clinician," then adjusting Medicare reimbursement based on clinicians' performances, rewarding high-performing clinicians with bonus payments and penalizing low-performing clinicians with rate cuts.  42 U.S.C. § 1395w-4(q)(1)(A).  The penalties can be significant—up to a 9% reduction from standard Medicare rates. *Id.* § 1395w-4(q)(6)(A)(iv), (q)(6)(B)(iv).

20.     CMS evaluates participating clinicians based on their activity over a "performance period," which is generally all or part of the calendar year.  *Id.* § 1395w-4(q)(4), (q)(5)(A); 42 C.F.R. § 414.1320.  Payment adjustments are applied two years later, in what CMS calls a MIPS "payment year."  42 C.F.R. § 414.1320.  Thus, in 2023, CMS calculated payment adjustments to be applied in 2024 based on patient encounters from 2022.  The MIPS payment adjustment affects the clinician's reimbursement for an entire year.  42 U.S.C. § 1395w-4(q)(6)(E).

21.     CMS calculates a clinician's or group's MIPS "final score" based on their scores across four performance categories: quality, resource use (*i.e.*, cost), clinical practice improvement activities, and meaningful use of certified electronic health record technology.  *Id.* § 1395w-4(q)(2); *see also* 42 C.F.R. § 414.1380(a).  Each category receives a specified default weight in the final score.  However, not all four performance categories apply to all MIPS eligible clinicians. When a performance category does not apply to a particular clinician or group, the weight normally assigned to the inapplicable category is redistributed across the other applicable performance categories.  42 C.F.R. § 414.1380(c)(2).  If a MIPS eligible clinician cannot be scored on two or more performance categories, then the clinician receives a neutral payment adjustment, *i.e.*,

standard Medicare rates for the MIPS payment year.  *Id.* § 414.1380(c).  Clinicians can participate in MIPS through their practice group, like plaintiffs did, in which case each MIPS eligible clinician in the group receives a final score based on the group's combined performance assessment.  42 U.S.C. § 1395w-4(q)(1)(D); 42 C.F.R. § 414.1310(e).  After these scores are calculated, CMS publishes them online.  *See* CMS, *2022 Doctors and Clinicians Performance Information: Guide to the Preview Period* 3, 13 (Nov. 2023), https://www.cms.gov/files/document/doctors-and-clinicians-preview-period-user-guide.pdf.

22.    CMS calculates clinicians' scores for the cost performance category based on its Medicare data.  42 C.F.R. § 414.1325(a)(2)(i).  MIPS eligible clinicians are required to submit data for other applicable performance categories.  *Id.* § 414.1325(a)(1).

23.    CMS identifies measures under the quality performance category, and MIPS eligible clinicians are required to submit data on at least six applicable quality measures of their choice.  *Id.* § 414.1335(a)(1).  If fewer than six measures apply, MIPS eligible clinicians report on each measure that is applicable.  *Id.*  There are nearly 200 quality measures for the 2022 performance period.  For example, the Anesthesiology Smoking Abstinence measure assesses the percentage of current smokers who abstain from smoking cigarettes prior to anesthesia on the day of an elective surgery or procedure.  Quality measures are posted on CMS's website: https://qpp.cms.gov/mips/explore-measures?tab=qualityMeasures&py=2022.  For the 2022 performance period, the quality score by default makes up 45% of the final MIPS score.  42 C.F.R. § 414.1330(b)(3).

24.    CMS evaluates a clinician's performance in the "improvement activities" category based on his completion of one or more activities from a list promulgated by CMS each year.  *Id.* § 414.1355(a).  For example, clinicians can earn "points" in this category by completing a training

course on prescribing opioids, systematically promoting comprehensive eye exams, or developing an "anti-racism" plan. CMS, *2023 Improvement Activities List* 14, 18–19 (Dec. 30, 2022), *available at* https://qpp.cms.gov/mips/explore-measures?tab=improvementActivities&py=2023. *But see Colville v. Becerra*, No. 1:22-cv-00113-HSO-RPM, Mot. for Summ. J. (Dkt. 79) (S.D. Miss. June 9, 2023) (challenging the anti-racism plan improvement activity as unlawful). The improvement activities score by default makes up 15% of the final MIPS score. 42 C.F.R. § 414.1355(b)(1).

25.     The final category, which CMS calls "promoting interoperability," grades clinicians on their use of "certified electronic health record technology." *Id.* § 414.1375. Clinicians receive full credit in this category by completing certain CMS-specified, technology-related tasks, such as conducting a data security analysis. *See id.* The promoting interoperability category by default accounts for 25% of the final MIPS score. *Id.*

26.     CMS develops cost measures under the cost performance category. *Id.* § 414.1350(a). A clinician group is not scored on the cost category at all if none of the measures applies to it for that performance year. *Id.* § 414.1380(b)(2)(v). For the 2022 performance year, the cost category score by default makes up 15% of the final MIPS score. *Id.* § 414.1350(d).

27.     For the 2017 through 2019 performance years, CMS issued the cost measures and the attribution rules for each measure in regulatory text. *Id.* § 414.1350(b). Beginning with the 2020 performance year, CMS established cost measures and their attribution methodologies according to measure specifications issued through rulemaking but not published in regulatory text. *See id.* § 414.1350(b)(8).

28.     For the 2022 performance year, CMS "use[s] cost measures that assess: The overall cost of care provided to Medicare patients, with a focus on the primary care they received[;] The

cost of services related to a hospital stay provided to Medicare patients[;] and Costs for items and services provided during 23 procedural and condition-based episodes of care for Medicare patients."   CMS, *2022 Cost Performance Category: Traditional MIPS Requirements*, https://qpp.cms.gov/mips/cost?py=2022 (last visited Dec. 10, 2023).

29.    The cost measure assessing "[t]he overall cost of care provided to Medicare patients, with a focus on the primary care they received" is called the total per capita cost (TPCC) measure.   CMS has applied a version of this cost measure to certain clinicians since the 2017 performance year/2019 payment year.  42 C.F.R. § 414.1350(b)(2).  CMS's "attribution methods [for the TPCC measure] aim to measure the influence of a clinician on the cost of care of his or her patients."  81 Fed. Reg. 77,008, 77,168 (Nov. 4, 2016).  For that reason, it is critically important that costs are attributed to clinicians who have control over the relevant costs.

30.    For the 2017 through 2019 performance years, CMS applied an attribution methodology that sought to assign a beneficiary (and his associated total Medicare costs) to the clinician who provided the most primary care services to that beneficiary.   42 C.F.R. § 414.1350(b)(2); *see also* 81 Fed. Reg. 28,162, 28,196–99 (May 9, 2016) (proposed rule preamble discussion); 81 Fed. Reg. at 77,166–69 (final rule preamble discussion).

31.    In 2019, CMS altered the attribution rules for the TPCC measure.  In a proposed rule, CMS explained that it had "reevaluated" the TPCC measure and was proposing "substantial changes to the attribution methodology."  84 Fed. Reg. 40,482, 40,754 (Aug. 14, 2019).  As the final rule explained, the reevaluation "was informed by feedback received … through prior public comment periods" and feedback from CMS's measure development contractor.  84 Fed. Reg. 62,568, 62,969 (Nov. 15, 2019).  As part of this feedback, stakeholders had articulated concerns to CMS that the initial TPCC "attribution methodology assigned costs to clinicians over which the

clinician has no influence," and "[t]he attribution methodology did not effectively identify primary care relationships between a patient and a clinician and could potentially attribute beneficiaries to a clinician not responsible for the beneficiaries' primary care." *Id.* Thus, CMS "proposed to change the attribution methodology to more accurately identify a beneficiary's primary care relationships." *Id.*

32.    Under the new attribution rules, "a primary care relationship is identified by a candidate event, defined as the occurrence of an [evaluation and management (E/M)] service such as an established patient assisted living visit or an outpatient visit (that is, the E/M primary care service), paired with one or more additional services indicative of general primary care (for example, routine chest X-ray, electrocardiogram, or a second E/M service provided at a later date). The candidate event initiates a year-long risk window from the E/M primary care service. The risk window is the period during which a clinician or clinician group could reasonably be held responsible for the beneficiary's treatment costs … ." *Id.* at 62,970.

33.    Most relevant here, CMS also changed the TPCC attribution methodology to, in its view, "more accurately identify clinicians who provide primary care services, by the addition of service category exclusions and specialty exclusions." *Id.* Under this new attribution methodology, "candidate events are excluded if they are performed by clinicians who: (1) Frequently perform non-primary care services (for example, global surgery, chemotherapy, anesthesia, radiation therapy); or (2) are in specialties unlikely to be responsible for providing primary care to a beneficiary (for example, podiatry, dermatology, optometry, ophthalmology)." *Id.* "As a result of these exclusions, clinician specialties considered for attribution are only those primarily responsible for providing primary care, such as primary care specialties and internal

medicine subspecialties that frequently manage patients with chronic conditions that are in their area(s) of expertise." *Id.* Anesthesiologists are among the excluded specialties.

34.     Commenters reacted to the proposed changes by "express[ing] concern that physician assistants … and nurse practitioners … that work in collaboration with excluded specialties would still be attributed patient costs based on this methodology." *Id*. at 62,972. CMS brushed aside these comments in a single conclusory sentence that failed to respond to their substance: "We have assessed the frequency of TINs being attributed solely though [sic] physician assistants and nurse practitioners, and found that this occurs infrequently." *Id.*

35.     CMS finalized its proposal. *Id.* at 62,974. Although the revised TPCC measure was set to take effect in the 2020 performance year, CMS automatically reweighted the cost category to 0% for the 2020 and 2021 performance years due to the COVID-19 public health emergency. CMS, *2021 Cost Requirements*, https://qpp.cms.gov/mips/cost?py=2021 (last visited Dec. 14, 2023); CMS, *Participating in the Cost Performance Category in the 2020 Performance Year* 2, https://qpp-cm-prod-content.s3.amazonaws.com/uploads/1124/2020%20MIPS%20Cost%20User%20Guide.pdf (updated May 20, 2021). Accordingly, the 2022 performance year/2024 MIPS payment year is the first time CMS has applied the revised TPCC measure. Details about the 2022 TPCC measure specifications, including the attribution methodology, can be found in CMS's TPCC Measure Information Form, 2022 Performance Period, *available at* https://qpp.cms.gov/docs/cost_specifications/2021-12-13-mif-tpcc.pdf.

36.     If a clinician or group is attributed just 20 beneficiaries under this methodology, then the clinician or group will be scored on the TPCC measure. 42 C.F.R. § 1350(c)(1).

37.     To calculate a MIPS payment adjustment, CMS compares a clinician's MIPS final score to CMS's identified "performance threshold." *Id.* § 414.1405(a). Clinicians with a final

score at the performance threshold receive a neutral, or zero, payment adjustment. *Id.* § 414.1405(b). Clinicians with a final score above the performance threshold receive a positive payment adjustment, and clinicians with a final score below the performance threshold receive a negative payment adjustment. *Id.*

38.     Under CMS's methodology for calculating final MIPS scores, the vast majority of healthcare providers have historically received a final score above the performance threshold, entitling them to positive payment adjustments. The Government Accountability Office has reported "that at least 93 percent of providers qualified for a positive payment adjustment, and less than 5 percent of providers qualified for a negative payment adjustment in any year from 2017 through 2019." Gov't Accountability Off., *supra*  at 7. In 2020, 98.12% of MIPS eligible clinicians "avoided a negative payment adjustment," and that figure remained over 96% in 2021. CMS, *2021 Quality Payment Program Experience Report* 37, https://qpp-cm-prod-content. S3.amazonaws.com/uploads/2433/2021%20QPP%20Experience%20Report.pdf (last visited Dec. 18, 2023).

39.     The money to pay for these positive payment adjustments comes from the providers assigned negative payment adjustments by CMS: Congress directed that the estimated amount of positive payment adjustments equal the estimated amount of negative payment adjustments. 42 U.S.C. § 1395w-4(q)(6)(F); *see also* 42 C.F.R. § 414.1405(b)(3). In other words, the estimated penalties CMS imposes on providers are redistributed as bonuses to other providers. Because "relatively few providers earned negative adjustments in 2017, 2018, and 2019, relatively few funds were available to spread out over a large number of providers who earned positive adjustments," which "ranged up to 1.88 percent, depending on the year." Gov't Accountability Off., *supra*, at 7. All estimated bonuses and penalties remain estimates until the end of a MIPS

payment year, because the final amounts on either side of the ledger depend on the volume of services ultimately furnished by each MIPS eligible provider during the upcoming year.

40.     CMS offers an administrative appeal process called a "targeted review," which allows clinicians to seek review of their MIPS payment adjustments.  *See* 42 C.F.R. § 414.1385. CMS's decision "on the targeted review [is] final, and there is no further review or appeal."  *Id.* § 414.1385(a)(7).

41.     MIPS reporting is a burdensome process for providers.  One study estimated that healthcare providers spent an average of $12,811 per physician in 2019 to satisfy the reporting obligations associated with their mandatory participation in the MIPS program.  Dhruv Khullar et al., *Time and Financial Costs for Physician Practices to Participate in the Medicare Merit-based Incentive Payment System: A Qualitative Study*, JAMA Health Forum (May 14, 2021).  CMS itself estimated that reporting burdens for healthcare providers in the first year of the program would be more than $1.3 billion.  Medicare Payment Advisory Comm'n, *Report to the Congress: Medicare Payment Policy* 446 (Mar. 2018), https://www.medpac.gov/wp-content/uploads/import_data/ scrape_files/docs/default-source/reports/mar18_medpac_entirereport_sec_rev_0518.pdf.

## FACTUAL ALLEGATIONS

42.     Plaintiffs are anesthesia practices.  Each plaintiff also employs non-physician practitioners, including physician assistants and nurse practitioners, to provide adjunct services such as pre- and post-operative check-ups.  To plaintiffs' knowledge, none of their non-physician practitioners serve as their patients' primary care provider.  Plaintiffs are Medicare participating providers and receive reimbursement from CMS for any services they furnish to a Medicare beneficiary.

43.    Plaintiffs have, as required, participated in the Quality Payment Program through the MIPS program since its inception.  Plaintiffs have historically performed well in the MIPS program, driven by their high quality scores.  For example, for the 2022 and 2023 MIPS payment years (2020 and 2021 performance years), plaintiffs each received a positive MIPS payment adjustment, ranging from 0.05% to 2.2%, based on high scores in the quality and clinical improvement activities performance categories.   The promoting interoperability performance category was not applicable to plaintiffs, and because CMS automatically reweighted the cost category to 0% for the 2022 and 2023 payment years due to the COVID-19 public health emergency,  plaintiffs were scored on only the quality and clinical improvement activities performance categories for the past two payment years.

44.    However, for the 2024 MIPS payment year, plaintiffs were also scored on the cost category solely because of the TPCC measure—none of the other cost measures applied to plaintiffs.  Although plaintiffs' anesthesiologists and certified registered nurse anesthetists fall within excluded specialty types, their anesthesiologist physician extenders such as physician assistants and nurse practitioners were *included* in the measure.  Within each plaintiff practice group, these practitioners furnished a relatively small number of TPCC candidate events representing just 0.23% of the total Medicare claims furnished across the four plaintiffs.  These services resulted in the four practices receiving approximately $80,000 total in Medicare reimbursement in 2022.  Yet because each plaintiff exceeded the 20-case threshold, each was scored on the TPCC measure, and therefore treated as if its non-physician practitioners were the primary care providers for the attributed beneficiaries.  If plaintiffs' anesthesiologist physician extenders had been properly excluded from attribution under the TPCC measure, then plaintiffs would not have been scored on the cost performance category at all.

45.     Due to the application of the TPCC measure, plaintiffs' final 2024 MIPS payment year scores—30% of which consisted of the cost category score—were below CMS's specified performance threshold.  But for CMS's application of the TPCC measure, cost performance would not have factored into plaintiffs' composite scores at all, and performance on the quality and clinical improvement activities performance categories would have been increased to 85% and 15%, respectively.  See 42 C.F.R. § 414.1380(c)(2)(ii)(F).  As a result, instead of receiving an upward reimbursement adjustment worth an estimated $1.3 million based on their scores on the quality and improvement activities measures, plaintiffs now face a reimbursement cut of approximately $2.4 million—a total penalty of approximately $3.7 million, solely because of CMS's arbitrary and unlawful application of the TPCC measure.

46.     Plaintiffs submitted targeted review requests of their 2024 MIPS payment year scores, arguing that applying the TPCC measure to their entire practice groups solely because of collateral services provided by a few of their clinicians was an unfair interpretation and application of the MIPS rules, and was arbitrary and inconsistent with CMS's stated goal of excluding specialists who are not responsible for their patients' primary care costs.  CMS notified plaintiffs of the denial of their targeted review requests on October 20, 2023.  CMS stated that the denials were "final" and not subject to "further review."

47.     Plaintiffs invest substantial clinical, technical, and financial resources to furnish the kind of high quality patient care that has earned them exemplary MIPS scores in the past. Moreover, in their dedication to efficient and cost-effective quality care, plaintiffs intend to continue employing non-physician practitioners to provide routine, but non-primary care, services—despite the perverse incentives CMS is creating to shift these services to higher-cost clinicians excluded from the TPCC measure.  Ignoring multiple appeals from the industry,

including from plaintiffs themselves, CMS has shown no willingness to fix the flawed TPCC measure.  And while plaintiffs are exploring whether to stop billing for services that would otherwise trigger application of the TPCC measure, this self-help effort would impose harms in the form of unfairly denying plaintiffs any compensation for high-quality, medically necessary services rendered.  Only this Court's intervention can prevent plaintiffs from having to punish themselves to escape application of CMS's unlawful TPCC measure in future years.

### COUNT I—5 U.S.C. § 706(2)(A), (C), 42 U.S.C. § 405(g)

### THE TPCC ATTRIBUTION METHODOLOGY EXCEEDS DEFENDANTS' STATUTORY AUTHORITY AND IS ARBITRARY AND CAPRICIOUS AS APPLIED TO PLAINTIFFS

48.     The foregoing paragraphs are incorporated by reference.

49.     The APA provides that courts will "hold unlawful and set aside agency action" that is "arbitrary [and] capricious" or "in excess of statutory jurisdiction, authority, or limitations[.]" 5 U.S.C. § 706(2)(A), (C).  As applied to plaintiffs, the TPCC attribution methodology is both in excess of defendants' statutory authority and arbitrary and capricious.

50.     Defendants exceeded their statutory authority by applying the TPCC cost measure to plaintiffs in a manner that attributed to them the performance of other clinicians.  Congress directed the Secretary to establish the MIPS program, through which the Secretary must develop methods "for assessing the total performance *of each MIPS eligible professional*." 42 U.S.C. § 1395w-4(q)(1)(A)(i) (emphasis added).  The statutory mandate is therefore that MIPS must evaluate providers based on their *own* performance; the Secretary cannot implement MIPS in a way that assesses and scores providers based on actions attributable to others.  But that is precisely the effect of applying the TPCC measure to plaintiffs, and therefore attributing to them the costs imposed by other clinicians over whom plaintiffs have no control.  Plaintiffs are, in short, being

17

"assess[ed]" on the performance of others.   Such an assessment exceeds defendants' statutory authority.

51.   Even if the TPCC's attribution rule was not foreclosed by the statute, it is still unlawful because it is unreasonable and not the product of the reasoned decisionmaking the APA requires.   An agency's action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).   This review "is not toothless." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019).   "In fact, … it has serious bite." *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021).

52.   CMS's refusal to exclude non-physician practitioners at specialty practices from the TPCC attribution rule is arbitrary and capricious as applied to plaintiffs.   CMS recognized in 2019 that "[c]linicians managing patients' care are the primary focus of the TPCC measure," and therefore revised the TPCC measure to avoid improperly "assign[ing] costs to clinicians over which the clinician has no influence" and "potentially attribut[ing] beneficiaries to a clinician not responsible for the beneficiaries' primary care."   84 Fed. Reg. at 62,969.   Commenters pointed out that, consistent with those goals, CMS should take steps to avoid attributing patient costs to physician assistants and nurse practitioners that work in excluded specialty practices. *Id.* at 69,972.   CMS, however, dismissed this concern by perfunctorily noting that such attribution "occurs infrequently." *Id.*   CMS provided no data to support that claim.   But even accepting CMS's *ipse*

*dixit* as true, the agency failed to explain why it could not fix a flaw in its rule that admittedly leads to results contrary to its stated goals.

53.     Accordingly, the TPCC measure's attribution methodology is "in excess of statutory … authority," and is "arbitrary [and] capricious" as applied to anesthesiologist physician extenders at plaintiffs' otherwise excluded anesthesia practices.  5 U.S.C. § 706(2)(A), (C).

## COUNT II—5 U.S.C. § 706(2)(B), U.S. CONST. AMEND. XIII

### AS APPLIED TO PLAINTIFFS, THE TPCC MEASURE IS AN EXCESSIVE FINE IN VIOLATION OF THE EIGHTH AMENDMENT TO THE U.S. CONSTITUTION

54.     The foregoing paragraphs are incorporated by reference.

55.     The Eighth Amendment to the United States Constitution prevents the government from imposing "excessive fines."  U.S. Const, amend. VIII.  The purpose of the Excessive Fines Clause is to "limit the government's power to punish."  *Austin v. United States*, 509 U.S. 602, 609 (1993).  This "protection against excessive fines has been a constant shield throughout Anglo-American history."  *Timbs v. Indiana*, 139 S. Ct. 682, 689 (2012).

56.     An economic sanction imposed by the government is subject to Eighth Amendment scrutiny if it "serv[es] *in part* to punish."  *Tyler v. Hennepin County*, 598 U.S. 631, 648 (2023) (Gorsuch, J., concurring) (quoting *Austin*, 509 U.S. at 610).  It "matters not whether the scheme" that led to the sanction "has a remedial purpose, even a predominantly remedial purpose."  *Id.*  A sanction qualifies as "punishment" if it furthers "either retributive or deterrent purposes."  *Kokesh v. SEC*, 581 U.S. 455, 467 (2017) (quoting *Austin*, 509 U.S. at 610).

57.     The government's withholding of funds that it is otherwise required to pay in order to deter certain behavior is no less punitive than when the government sanctions by removing from a bank account money that it has already paid out.  If that were not the case, the "[p]rotection against excessive punitive sanctions"—which is "fundamental to our scheme of ordered liberty"—

would mean very little. *Timbs*, 139 S. Ct. at 689. The government cannot avoid scrutiny under the Excessive Fines Clause by imposing the same punitive sanction in one form rather than another.

58.     When a sanction serves a punitive purpose, even if just in part, the Excessive Fines Clause prohibits that sanction from being grossly disproportionate to the gravity of the underlying conduct. *See United States v. Bajakajian*, 524 U.S. 321, 324, 334 (1998). Courts have considered several factors when making this inquiry, including the harm—or lack thereof—caused by the conduct that led to the sanction. Other factors contemplate an underlying criminal conviction, but the Excessive Fines Clause is not limited to that context. *See Austin*, 509 U.S. at 610.

59.     CMS's application of the TPCC measure to plaintiffs constitutes a punitive economic sanction, so it is subject to the strictures of the Eighth Amendment. Because of the TPCC measure, CMS will withhold from plaintiffs nearly $4 million more than it otherwise would have paid. And the MIPS scheme underlying this reimbursement reduction serves, at least in part, a punitive purpose: it seeks to deter certain provider behavior and practices by penalizing providers in the form of Medicare reimbursement that is less than standard Medicare rates.

60.     CMS's punitive economic sanction is grossly disproportionate, and indeed has no logical relationship, to plaintiffs' conduct. CMS is punishing plaintiffs for their supposed failure to reduce primary care costs—even though they have no control over those costs because they do not provide primary care. CMS has not identified any harm resulting from plaintiffs' practices. Nor could it, because there is none.

61.     Accordingly, applying the TPCC measure to plaintiffs violates the Excessive Fines Clause of the Eighth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and grant the following relief:

(1)    A declaration that CMS acted unlawfully in applying the TPCC measure to plaintiffs;

(2)    An injunction:

      a.    Requiring CMS to adjust any Medicare payments made to plaintiffs pursuant to a MIPS score that takes the TPCC measure into account;

      b.    Barring CMS from applying to plaintiffs a MIPS score for the 2022 Performance Year/2024 Payment Year that takes the TPCC measure into account; and

      c.    Barring CMS from applying the TPCC measure to plaintiffs in the future;

(3)    Alternatively, to the extent the Court exercises jurisdiction pursuant to 28 U.S.C. § 1361, an order compelling defendants to perform their duty to properly calculate plaintiffs' MIPS scores, including by applying the TPCC measure in a lawful manner;

(4)    Attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

(5)    Any other just and proper relief.

Dated: December 18, 2023

Respectfully submitted,

LOVELL ISERN & FARABOUGH, LLP
Brian W. Farabough, TX SBN 24072989
brian@lovell-law.net
112 SW 8th Avenue, Suite 1000
Amarillo, Texas 79101-2314
Telephone: (806) 373-1515
Facsimile: (806) 379-7176

*By: /s/ Brian W. Farabough*
        Brian W. Farabough


BRENNA E. JENNY (*pro hac vice forthcoming*)
bjenny@sidley.com
D.C. Bar No. 1034285
ERIC D. MCARTHUR (*pro hac vice forthcoming*)
emcarthur@sidley.com
Virginia Bar No. 74142
D.C. Bar No. 987560
CODY M. AKINS (*pro hac vice forthcoming*)
cakins@sidley.com
Texas Bar No. 24121494
D.C. Bar No. 90012255
HUNDLEY POULSON (*pro hac vice forthcoming*)
hpoulson@sidley.com
D.C. Bar No. 90015456
Maryland Bar No. 2211290127

SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8572

*Counsel for Plaintiffs*